UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 10534 PBS

MAGISTRATE JUDGE

| | |
|---|---|
| GEORGE SLAYBE and PAMELLA YAMEEN | : |
| | : Civil Action No. _____ |
| Plaintiffs, | : |
| v. | : COMPLAINT |
| | : |
| COLUMBIA MANAGEMENT ADVISERS, INC. | : |
| | : JURY TRIAL DEMANDED |
| Defendant. | : |

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED Yes
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. P.O.M
DATE 3\16\04

Plaintiffs bring this Complaint based upon information and belief, except for their own actions, which are based upon personal knowledge. Their information and belief are based upon the investigation of their counsel, which included a review of regulatory filings, complaints filed by the Securities and Exchange Commission ("SEC") and the New York Attorney General, press releases and media reports concerning the conduct alleged herein.

## NATURE OF THE ACTION

1.      This is a direct shareholder action for violation of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq.* Defendant Columbia Management Advisers Inc. ("CMA") is the investment advisor for the Columbia family of Funds (collectively, the "Columbia Funds") including the fund owned by Plaintiffs, the Columbia Young Investors Fund, Columbia Small Company Index Fund, Columbia Large Company Index Fund, Columbia International Equity Fund, and Columbia Large Cap Core Fund (collectively, "Plaintiffs' Funds").

2.      CMA has entered into investment advisory agreements with Plaintiffs' Funds, pursuant to which it has earned, and continues to earn, millions of dollars each year. CMA procured these lucrative

agreements without disclosing that between 1998 and until at least 2003 it had allowed favored clients to engage in "market timing" transactions in shares of Columbia Funds, including Plaintiffs' Funds, to the detriment of the Funds and their shareholders.

3.    "Market timing" transactions are short-term trades in and out of a mutual fund, for the purpose of exploiting idiosyncracies in the way mutual funds price their shares.  Those customers allowed to make these transactions are able to profit from late-breaking information and brief increases in the fund's value.  Market timing transactions benefit the fund advisor and its favored institutional investors, who are allowed to engaged in market timing at the expense of the funds and the shareholders.  The additional investments made by these market timers in the Columbia Funds caused the total assets of the market timed

reaping substantial additional compensation, at the expense of the funds and their other investors, by allowing select customers to engage in market timing transactions.

6.    Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), imposes a fiduciary duty on investment advisors with respect to the compensation earned by them and their affiliates. At a minimum, it requires the advisor to disclose all material facts to the fund directors concerning not only the compensation being earned but also the competence and integrity of the individuals who would be managing fund portfolios and the sufficiency of procedures to assure proper management of each fund. Defendant violated this provision by failing to disclose *all* the compensation it was earning as a result of its position as advisor to the Columbia Funds, and by misrepresenting that it was managing the funds in conformity with applicable laws and regulations, and in compliance with the Funds' own stated policies, when in fact neither was true.

7.    Because the approval of the investment advisory agreements with Plaintiffs' Funds was obtained in violation of the ICA, the agreements should be rescinded and/or declared unenforceable or void, pursuant to § 47(b) of the ICA, and all fees received during the past year should be refunded.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43; and 28 U.S.C. § 1331.

9.    Venue is proper in this District pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, since many of the acts took place in this District.

10.    Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the acts, practices and courses of business alleged herein.

## PARTIES

11.     Plaintiff George Slaybe, Custodian for Jo D. Slaybe (Uniform Gift to Minors Act) owns shares or units of Columbia Young Investor Fund (class A), a mutual fund regulated by the ICA. Plaintiff lives in Goffstown, New Hampshire.

12.     Plaintiff Pamella Yameen owns shares or units of Columbia Small Company Index Fund (class Z), Columbia Large Company Index Fund (class Z), Columbia International Equity Fund (class T), and Columbia Large Cap Core Fund (class T), mutual funds regulated by the ICA. Plaintiff lives in Haverhill, Massachusetts.

13.     Columbia Young Investor Fund (formerly named Liberty Young Investor Fund and Stein Roe Young Investor Fund prior thereto), Columbia Small Company Index Fund, Columbia Large Company Index Fund, Columbia International Equity Fund and Columbia Large Cap Core Fund (collectively, "Plaintiffs' Funds"), are mutual funds that are regulated by the ICA, managed by defendant CMA pursuant to investment advisory agreements, and which buy, hold, and sells securities. During the relevant period, defendant allowed the market timing of the Columbia Funds, including some of Plaintiffs' Funds, for their and their clients' benefit and to the detriment of the Columbia Funds and their shareholders. This action is brought on behalf of and for the benefit of Plaintiffs' Funds.

14.     Defendant CMA is the investment advisor to the roughly 140 mutual funds that comprise the Columbia family of funds ("Columbia Funds"),[1] including Plaintiffs' Funds. It is responsible for the

---

[1] The Columbia Funds are a group of funds currently owned by FleetBoston Financial Corporation. This group includes several funds (e.g., the Acorn, Newport, and Stein Roe fund groups) that had belonged to Liberty Financial Investments until late 2001, when Liberty was acquired by FleetBoston. By September 2003, the names of the various fund groups FleetBoston owned had been

-4-

Fund's day-to-day business, including placing all orders for the purchase and sale of the Fund's portfolio securities. CMA is a direct wholly owned subsidiary of Columbia Management Group, Inc., which is an indirect wholly owned subsidiary of FleetBoston Financial Corporation. CMA is a registered investment advisor under the Investment Advisers Act and has been an investment advisor since 1969. CMA is located at 100 Federal Street, Boston, Massachusetts.

15.    Columbia Funds Distributor, Inc. ("Columbia Distributors"), is the principal underwriter and distributor for the Columbia Funds and, in this role, disseminates the prospectuses for the Columbia Funds. It helped CMA to set up many of the market timing transactions. Prior to the acquisition of Liberty in November, 2001, it went by the name of Liberty Funds Distributor, Inc. It is a Massachusetts corporation, a broker-dealer registered with the SEC since 1992, and is a wholly-owned subsidiary of Columbia Management and an indirect subsdiary of FleetBoston.

16.    Columbia Fund Services, Inc. ("Columbia Services") is the transfer agent for the Columbia Funds.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    A mutual fund is an investment company that pools money from many investors and invests the money in stocks, bonds, short-term money-market instruments, or other securities. Shareholders purchase mutual fund shares from the fund itself (or through a broker for the fund), but are typically not able to purchase the shares from other shareholders on a secondary market, such as the New York Stock

_____

changed so that all were uniformly referred to by the name Columbia.

Exchange or Nasdaq. The price investors pay for mutual fund shares is the fund's per share net asset value

("NAV"), calculated by the fund each day, based on the market value of the securities in the fund's

portfolio, plus any shareholder fees that the fund imposes at purchase (such as sales loads). Mutual fund

shares are "redeemable," meaning that when mutual fund shareholders want to sell their fund shares, they

sell them back to the fund (or to a broker acting for the fund) at the fund's NAV, minus any fees the fund

imposes at that time (such as deferred sales loads or redemption fees).

18.     The investment portfolios of mutual funds are managed by separate entities known as

"investment advisors" that are registered with the SEC.   Investment advisors are retained by the mutual

fund companies pursuant to agreements which, among other things, details the compensation to be provided

by the fund to the advisor.  *See* ICA § 15(a), 15 U.S.C. § 80a-15(a).  These agreements must initially be

approved by the vote of a majority of the outstanding voting stock of the fund.  This is done at the

appropriate time through the issuance by the fund of a proxy statement, indicating the need to engage in

such an agreement or, as the time might require, amend or renew the agreement.  The issuance of proxy

statements is governed by the federal securities laws and the rules promulgated thereunder by the SEC.

*See* ICA § 20(a), 15 U.S.C. § 80a-20(a).

19.     An investment advisor generally employs portfolio managers, who have the discretion to

buy and sell securities in the fund's portfolio.  Portfolio managers must make investment decisions in

accordance with the fund's objectives as stated in the fund's prospectus and cannot make investment

decisions that are in their own interests rather than in the interests of the fund's shareholders. Portfolio

managers, as investment advisors, owe a fiduciary duty to fund shareholders of utmost good faith, and full

and fair disclosure of all material facts. In this case, defendant breached its fiduciary duties by not disclosing the market timing activities in the Columbia Funds.

### The Lure And Evils Of Market Timing

20.     Securities that trade on exchanges can change price at any time during the trading day, in reaction to relevant information as it becomes available. By contrast, mutual funds are priced only once per day, at 4:00 p.m. Eastern Standard Time, at the close of the major New York markets. At that time mutual funds calculate their NAVs, based on the closing market prices of the securities held in the funds' portfolios.

21.     *Market Timing.* Market timing takes advantage of stale pricing of mutual fund shares. Where funds hold shares that are traded on foreign exchanges, they use the foreign market closing price to calculate NAV, even though by 4:00 p.m. EST, those closing prices may already be stale. The foreign market may have closed 5-14 hours earlier, and in the interim important information may have been released which is likely to affect the market price of those foreign securities when the foreign markets reopen. While market timing is not prohibited by law, most mutual funds, including Plaintiffs' Funds, have publicly disclosed policies forbidding such trading because of their harmful impact on the funds and its shareholders.

22.     Unbeknownst to plaintiffs, defendant allowed its employees and select few clients to engage in market timing transactions. To be in a position to take advantage of these strategies, an investor must know what securities are heavily represented in a given fund's portfolio on any given day. Such information is typically available only to the managers of the fund; but here, those managers shared that information with favored institutional traders, to help them game the system.

23.     These types of transactions are harmful to long-term fund shareholders because they

increases the fund's transaction costs and siphon off a portion of the profits that otherwise would flow solely

to those shareholders.  They can also disrupt the fund's stated portfolio management strategy, require a

fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations.

These transactions can also result in unwanted taxable capital gains for fund shareholders and reduce the

fund's long-term performance.  In short, they benefit a select few at the expense of the fund and all other

fund shareholders.

**Columbia's Stated Policies Prohibit Market Timing**

24.     Defendant was well aware of the evils of market timing and made public statements

indicating that they would combat it.

25.     The prospectus for the Columbia Young Investors Fund (dated February 1, 2004) contains

the following language:

> FUND POLICY ON TRADING OF FUND SHARES
> The Fund is not intended for short-term or frequent trading in its shares. Short-term or
> excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio
> management and increase Fund expenses. In order to promote the best interests of
> shareholders, the Fund and any other funds distributed by Columbia Funds Distributor,
> Inc., reserve the right to reject any purchase order or exchange request, particularly from
> market timers or investors who, in the advisor's opinion, have a pattern of short-term or
> excessive trading or whose trading has been or may be disruptive.

26.     This is nearly identical with language in past prospectuses for Plaintiffs' Funds and for other

Columbia Funds.  Indeed, the previous prospectus for the Columbia Young Investors Fund (dated

February 1, 2003) contained the following language:

FUND POLICY ON TRADING OF FUND SHARES
The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of shareholders, the Fund (and the other funds distributed by Liberty Funds Distributor, Inc.) reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive.

27.     Other Columbia Funds prospectuses have similar language. From 1998 through 2000, the prospectuses for a number of the Columbia Funds contained disclosures stating that shareholders would be limited in the number of exchanges they could make during a given period. They all reflected CMA's long-standing policy to prohibit market timing activities in the Columbia Funds.

28.     For example, the prospectuses for the Acorn Fund Group represented that investors would generally be permitted to make only up to four round trip exchanges per year, defining a round trip as an exchange out of one fund into another fund and then back again.

29.     Further, starting in May 1999, certain Columbia Funds belonging to the Acorn Fund Group began representing in their respective prospectuses that "[t]he Acorn funds do not permit market-timing and have adopted policies to discourage this practice."

30.     In the Fall of 2000, a number of the Columbia Funds belonging to Liberty (e.g. the Acorn Fund Group) began including in their respective prospectuses the following disclosure expressly stating that short-term or excessive trading was prohibited (the "Strict Prohibition"):

The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or

-9-

excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

31.     By the Spring of 2001, the rest of the Columbia Funds belonging to Liberty (e.g., the Newport and Stein Roe fund groups) began including the Strict Prohibition in their prospectuses. CMA retained this disclosure language upon FleetBoston's acquisition of the funds from Liberty, and in early 2002, adopted the same disclosure for most of the funds that had belonged to FleetBoston prior to the acquisition. In the Spring of 2003, CMA amended the Strict Prohibition language in certain of the prospectuses to make clear that other funds distributed by Columbia Distributor similarly reserved the right to reject trade requests from market timers or investors with a pattern of short-term or excessive trading.

32.     Thus, defendant, the Columbia Funds, and the funds' shareholders all knew of market timing.   All were also aware of the harmful effects these activities can have on the funds and its shareholders, as well as the fiduciary obligations of the advisor to act in the funds' best interest to stop them. Nevertheless, improper trading activity in the Columbia Funds, whether expressly authorized or tacitly permitted, continued to the detriment of the Columbia Funds and its shareholders and to the benefit of defendant and its favored clients.

### The Misconduct At Columbia Is Uncovered

33.     The market timing by favored clients in the Columbia Funds continued for years and would be continuing to this day were it not for the investigation of the SEC and the New York Attorney General.

34.     It was not until February 23, 2004, that federal and state authorities disclosed that from at least 1998 through 2003, CMA had secretly entered into arrangements with at least nine entities – investment advisors, hedge funds, brokers and individual investors – allowing them to engage in frequent

-10-

trading in particular mutual funds, including two of Plaintiff's Fund. All but one of these investors made multiple "round trips" (each round trip consisting of a purchase and subsequent sale) per month and some made hundreds of round trips, in amounts totaling over $2.5 billion. In connection with certain of the arrangements, CMA accepted so-called "sticky assets," which are long-term investments that were to remain in place in return for allowing the investors to actively trade in the funds. After entering into these arrangements, the nine companies and individuals engaged in frequent market timing transactions in at least sixteen different Columbia Funds, including Plaintiffs' Funds.

**A.    Nine Entities Market Time The Columbia Funds**

   **1. Ilytat's Arrangement and Trading**

   35.    From April 2000 through October 2002, Ilytat, L.P., a San Francisco hedge fund, and its affiliates ("Ilytat") made almost 350 round trips in seven international Columbia Funds. A substantial number of these trades were made pursuant to an arrangement with Columbia Distributor and approved by CMA, which allowed Ilytat to engage in frequent and short-term trading in the Newport Tiger Fund (the "Newport Tiger Fund"), an Asian equity fund.

   36.    Through 2000 and early 2001, the prospectus for the Newport Tiger Fund noted that "[s]hort-term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders." Starting in May 2001, the prospectus included the Strict Prohibition representation.

   37.    Notwithstanding the language in the prospectus, Columbia Distributor, with the approval of the Newport Tiger Fund's portfolio manager, allowed Ilytat, which it identified as a market timer, to enter into a "sticky-assets" arrangement. Under this arrangement, Ilytat was to place $20 million in the

-11-

Newport Tiger Fund, with two thirds of that amount to remain static and one-third to be actively traded. According to calculations about the Newport Tiger Fund, Ilytat placed over $133 million in the fund in 2000 and redeemed $104 million. Further, during the first five months of 2001, Ilytat's purchases or exchanges accounted for $72 million out of the $204 million in total purchases made by all investors in the Newport Tiger Fund. During the same five-month period, Ilytat made redemptions totaling $60 million.

38.      The portfolio manager for the Newport Tiger Fund repeatedly wrote to the president of Columbia Distributor expressing concern about Ilytat's trading activity and the harm that this trading activity could have on the fund and its investors. By the same token, by June 2000, CMA president became concerned that Ilytat appeared to be making weekly trades of $7 million in and out of the Newport Tiger Fund.

39.      Notwithstanding these concerns, Ilytat was allowed to continue trading in the Newport Tiger Fund until September 2002. During the 30 months from April 2000 to September 2002 during which it actively traded in the Newport Tiger Fund, Ilytat made almost 90 round trips in amounts of up to $13 million apiece. This activity included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Strict Prohibition representation.

40.      Ilytat also traded extensively in the Acorn International Fund during the period from September 1998 through October 2003. During the period from September 1998 through September 2000, the prospectus for the fund stated that investors would be permitted to make only up to four round trips per year. Further, as of May 1999, the prospectus for the fund stated that market timing would not be permitted in the fund. In addition, by the end of September 2000, CMA began including the Strict Prohibition representation in the fund's prospectus.

-12-

41.    Despite these representations, from September 1998 through October 2003, Ilytat made 73 round trips in the fund, including 27 round trips in 1999 and 18 round trips in 2000. From July 2000 to December 2001, the period during which it most actively traded the Acorn International Fund, Ilytat made at least 40 round trips in the fund in amounts of up to $15 million. This activity included 27 round trips made after CMA had begun to include the Strict Prohibition representation in the fund's prospectus.

42.    Ilytat also traded extensively in the Acorn International Select Fund during the period from July 2000 through June 2001. Throughout this period, the prospectus for the Acorn International Select Fund included CMA's Strict Prohibition representation. Contrary to this representation, from July 2000 to June 2001, Ilytat made about at least 20 round trips in the Acorn International Select Fund in amounts of up to $3 million.

43.    In addition, from September 1999 through October 2000, Ilytat also made more than 40 round trips (over 10 in 1999 and over 30 in 2000) in amounts of $100,000 or more in the Acorn International Select, which went by the name Acorn Foreign Forty Fund at the time. This trading activity was contrary to CMA's representation in the prospectus for the fund that traders would be restricted to four trades per year and further, that market timing would not be permitted.

44.    From August 2000 through October 2000, Ilytat also actively traded in the Stein Roe International Fund. During this period, CMA represented in the prospectus for the Stein Roe International Fund that traders would generally be limited to four telephone exchange round trips per year. Notwithstanding the disclosure, Ilytat made over 80 round trips of up to $1.4 million during this three-month period.

45.    From April 2000 to September 2000, Ilytat also actively traded in the Newport

-13-

International Equity Fund, making approximately 19 round trips during this five-month period in amounts of up to $2 million. During the eight-month period from February 2002 to October 2002, Ilytat made at least 10 round trips of up to $16 million in the Columbia International Equity Fund (formerly the Galaxy Equity Growth Fund) . Plaintiff Yameen owns shares or units of the Columbia International Equity Fund.

### 2. Ritchie Arrangement and Trading

46.     From January 2000 through September 2003, Ritchie Capital Management, Inc. ("Ritchie"), a hedge fund manager, was allowed to trade frequently in the Newport Tiger Fund and the Columbia Growth Stock Fund (formerly the Stein Roe Advisor Growth Stock Fund) ("Growth Stock Fund"), making over 270 round trips.

47.     Ritchie made most of its trades in the Newport Tiger Fund. During the period from January 2000 through April 2001, notwithstanding the language in the fund's prospectus regarding the potential harm caused by short-term market timers, Ritchie made 153 round trips. In addition, from May 2001 through September 2002, Ritchie made 105 trades in the Newport Tiger Fund even though the prospectus included the Strict Prohibition representation during this period.

48.     In 2001, Columbia Distributor discussed an arrangement with Ritchie under which it would be allowed to make up to 12 round trips per year in the Newport Tiger Fund. In addition, at the end of 2001, Columbia Distributors' Senior Vice President met with Ritchies principals and discussed the possibility of a "sticky-asset" arrangement. More specifically, they discussed the possibility of Ritchie placing long-term assets in a fixed income fund to offset their activity in Tiger." The Senior Vice President's subordinate summarized the proposal as follows: "we would need to see some money from them...if they

-14-

were going to continue to use Tiger." At the time, Ritchie's $52 million position in the Newport Tiger Fund accounted for nearly 10% of its $525 million in assets.

49.     In early 2002, Ritchie began negotiating with Columbia Distributor an arrangement to actively trade the Growth Stock Fund, a large cap fund, which by then included the Strict Prohibition disclosure in its prospectus. Ritchie's initial proposal was to place up to $200 million in the fund (which at that time had a total asset value of approximately $776 million), with the ability to trade up to half of that amount every day. Columbia Distributor countered with a proposal to keep 90% of the investment in place for 90 days, with no limit on trades of the remaining 10%. CMA's portfolio manager for the fund was aware of these negotiations and provided his input. Shortly thereafter, Ritchie began trading in the Growth Stock fund, making five round trips in two months in amounts of up to $7 million.

50.     In early 2003, Ritchie entered into a "sticky-asset" arrangement with Columbia Distributor under which it agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with no limits on the number of trades per month, and place another $10 million in the Columbia Short Term Bond Fund as a "static" (non-trading) asset. Columbia Distributor's CEO and the CMA portfolio manager for the Growth Stock Fund both approved the arrangement. Overall, pursuant to its arrangements with Columbia Distributor and contrary to CMA's Strict Prohibition representation in the fund's prospectus, Ritchie made approximately 18 round trips in the Growth Stock Fund from June 2002 through September 2003.

### 3. Canary's Arrangements and Trading

51.     During late 2002 and early 2003, entities controlled by Canary Capital Corp. ("Canary") negotiated trading arrangements with Columbia Distributor through two intermediaries. In early 2003, Epic

Advisers, on behalf of Canary, entered into an arrangement with Columbia Distributor, approved by its

National Sales Manager, under which Canary entities agreed to make investments in three funds (*i.e.,* the

Columbia Growth & Income Fund, the Columbia Select Value Fund, and the Columbia [then Stein Roe]

Growth Stock Fund [the "Growth Stock Fund"], a large cap fund), totaling $37 million. Despite the fact

that CMA had included the Strict Prohibition disclosure in the prospectus for each of these three funds, the

arrangement permitted Canary entities to make three round trips per month in each fund.

52.    In late 2002 or early 2003, Canary also entered into an arrangement with Columbia

Distributor pursuant to which he placed $5 million in the Columbia High Yield Fund (the "High Yield

Fund"), a high-yield bond fund. Despite the fact that CMA had included the Strict Prohibition disclosure

in the prospectus for the High Yield Fund, Canary was permitted to make one round trip each month in the

fund. The portfolio manager for the High Yield Fund approved the arrangement. During the period from

November 2002 through July 2003, Canary made seven round trips in an average amount of $2.5 million.

### 4. Calugar's Arrangement and Trading

53.    In or around April 1999, Daniel Calugar ("Calugar") reached an arrangement with

Columbia Distributor allowing him to place up to $50 million in the Columbia Young Investor Fund – the

fund owned by Plaintiff Slaybe – targeting investments by children, and the Growth Stock Fund, with

permission to make one round trip per month using his entire position. The portfolio manager for the

Growth Stock Fund, as well as Columbia Distributor's Managing Director of National Accounts and Senior

Vice President approved the arrangement.

54.    The 1998 Young Investor Fund owner's manual states on its front cover that it is "[t]he

investment that's also an education." Pictures of children and children's handwriting are found throughout

-16-

the manual. In the manual, the President of Stein Roe indicates that the Young Investor Fund was developed to alleviate the fears that the financial markets can bring to a first-time investor. Investors who purchased shares in the Young Investor Fund would periodically receive educational materials "that will help [them] make informed investment decisions." These materials did not mention Columbia's timing arrangement.

55.    Instead, the prospectuses for the years 1998 through 2000 and the owner's manual indicate that "the Young Investor Fund is designed for long-term investors." These prospectuses include a disclosure limiting the number of exchanges per year: "you will be limited to four telephone exchange round-trips per year." In 2001 the Young Investor Fund adopted specific anti-market-timing language: "[t]he Fund does not permit short-term or excessive trading. Excessive purchases, redemptions or exchanges of Fund shares disrupts portfolio management and increases Fund expenses."

56.    In 2000, notwithstanding the supposed terms of the arrangement, Calugar, on average, made more than one round trip every trading day in various of the Columbia Funds. At the time, CMA represented in the prospectuses for the Young Investor Fund and the Stein Roe International Fund that investors were generally limited to four telephone exchange round-trips per year. However, during 2000, Calugar made over 200 round trips in the Young Investor Fund, placing trades of up to $2.3 million at a time, and during the four month period from January 2000 through April 2000, he also made at least 13 round trips in the Stein Roe International Fund.

57.    During the period from January 2000 through February 2001, Calugar also made nearly 70 round trips in the Growth Stock Fund, placing trades of up to $4 million at a time. Throughout 2000 and

into January 2001, he also made approximately 20 round trips in the Newport International Equity Fund, in amounts of up to $6.6 million.

### 5. Giacalone Arrangement and Trading

58.     In late 2000, Columbia Distributor, with the approval of its President, entered into a "sticky-asset" arrangement with Sal Giacalone ("Giacalone"). Under the arrangement, which was approved by the head of the Newport Fund Group, Giacalone was allowed to make four round trips per month of up to $15 million in the Newport Tiger fund. In return, Giacalone was required to place $5 million in "long term assets" in Acorn Funds.

59.     Notwithstanding the supposed terms of his arrangement and the language in the prospectus discussing the potential harm caused by short-term market timers, Giacalone made a total of 43 round trips in the Newport Tiger Fund during six months of trading from November 2000 through April 2001. During the first two months of 2001 alone, Giacalone made at least 30 round trips in amounts of up to $4.7 million.

### 6. D.R. Loeser Arrangement and Trading

60.     In late 1998, Columbia Distributor entered into an arrangement with D. R. Loeser ("Loeser"), a registered investment advisor, allowing Loeser to make five round trips per month of up to $8 million in the Growth Stock Fund. Columbia Distributor's Senior Vice President, the president of the Stein Roe fund complex, to which the Growth Stock Fund belonged at that time, and the Growth Stock Fund portfolio manager all approved the arrangement.

61.     During the first five months of 2000, Loeser made approximately 20 round trips in the Growth Stock Fund. In addition, despite the fact that the prospectus for the Young Investor Fund

-18-

represented that investors were generally limited to four telephone exchange round trips per year, Loeser made 20 round trips in the Young Investor Fund during this same period in amounts of up to $16.6 million.

### 7. Signalert Arrangement and Trading

62.    Beginning in 1999, Signalert, a registered investment advisor, began trading in Columbia Funds under arrangements with Columbia Distributor. Initially, Signalert was allowed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund, with the ability to make up to 10 round trips annually in each of these two funds. At the time, the prospectus for the Young Investor Fund stated that investors were limited to four telephone exchange round trips in and out of the fund per year. Under the arrangement, Signalert was also to place $5 million in each of six funds, trading just once a quarter.

63.    Columbia Distributor senior management subsequently pushed to increase the size of Signalert's investments. In late 1999, as part of a "sticky-asset" arrangement, Signalert agreed to place an additional $10 million in the Growth Stock and Young Investor funds, and to invest and maintain other assets in a money market fund, thereby allowing Columbia Distributor to generate a management fee off those assets. In return, Columbia Distributor allowed Signalert to make up to 12 round trips per year in each fund. The portfolio manager for both the Growth Stock Fund and the Young Investor Fund approved this

arrangement.

64.    During the first 11 months of 2000, notwithstanding the supposed terms of the arrangement, Signalert made over 60 round trips in the two funds, one every one to two weeks. Overall, during the period 2000-2001, Signalert made more than 50 round trips in the Growth Stock Fund and approximately

-19-

50 round trips in the Young Investor Fund. Moreover, as of February 2001, CMA had represented by way of the Strict Prohibition disclosures in the prospectuses for these funds that short-term or excessive trading would not be permitted. Yet, from February 2001 through August 2001, Signalert made 20 round trips in the Young Investor Fund. It also made over 20 round trips in the Growth Stock Fund from February 2001 through December 2001.

65.    Signalert also began trading in four additional funds: the Stein Roe Income Fund (a bond fund), the Acorn Fund (a small to mid cap fund), the Galaxy Equity Value Fund (a large cap fund), and the Galaxy Growth & Income Fund. Despite the fact that the Stein Roe Income Fund and the Acorn Fund both included the Strict Prohibition representation in its prospectuses, Signalert made eight round trips in the Stein Roe Income Fund, all in the month of November 2001, and at least 15 round trips in the Acorn Fund during the period from March 2001 through February 2003. In addition, notwithstanding the fact that the two Galaxy funds generally limited investors to three exchanges per year, Signalert made approximately 23 round trips in the Galaxy Equity Value Fund and more than 25 round trips in the Galaxy Growth & Income Fund in a period of less than a year, from February 2001 through January 2002.

### 8. Waldbaum's Arrangement and Trading

66.    During late 2002, Columbia Distributor entered into a "sticky-asset" arrangement with investor Alan Waldbaum ("Waldbaum") under which he was allowed to make 10 round trips per year in the Columbia Tax-Exempt Fund ("Tax-Exempt Fund"), a municipal bond fund, if he moved less than $5 million each time and always kept $2 million in the fund. The arrangement was approved by the portfolio manager for the Tax-Exempt Fund.

-20-