67. At the time, the prospectus for the Tax-Exempt Fund included Columbia Advisers' Strict Prohibition representation. Notwithstanding Columbia Advisers' representation, Waldbaum made 10 round trips in the Tax-Exempt fund from November 2002 through October 2003.

### 9. Tandem's Arrangement and Trading

68. By early 2000, Tandem Financial ("Tandem"), an investment advisor, entered into an arrangement with Columbia Distributor, which was approved by its Senior Vice President. The arrangement permitted Tandem to make an unlimited number of trades in one or more of the Columbia Funds. Overall, pursuant to this arrangement, during the period from February 2000 through September 2003, Tandem made more than 100 round trips in the Tax- Exempt Fund.

69. During 2000, Tandem made approximately eleven round trips in the Tax-Exempt Fund. Starting in April 2001, the prospectus for the Tax-Exempt Fund prospectus included the Strict Prohibition disclosure. Despite the disclosure, Tandem made 106 round trips during the period from April 2001 through September 2003.

### B. CMA Authorized and/or Knew Of The Market Timing Activities

70. During the period 1998 to 2003, many of the Columbia Funds' portfolio managers and senior executives at CMA and Columbia Distributor authorized, knew of and/or disregarded the existence and detrimental effect of market timing transactions in the Columbia Funds. For example:

a. In the Spring of 2000, shortly after the peak of Calugar's trading in the Stein Roe International Fund, the fund's liaison with Columbia Distributor sent an e-mail to the heads of CMA, Columbia Distributor, and Columbia Services, with a chart that he summarized as showing: "for the last 6 weeks...$142,018,026 has gone into the Fund and $134,935,372 has gone out...These figures exceed the

e.  In December 2001, the portfolio manager of the Acorn International Fund complained that "timer money has created large swings in cash balances that are unprecedented ... very disruptive ... I believe timers hurt long term shareholders." Four days later, she noted that "Today ... one percent of the [fund's total] cash went out the door, making a mockery of the notion of managing cash levels ... We should talk about what to do."

f.  In July 2002, the portfolio manager for the Tiger Variable Fund experienced a problem with excess cash redemptions. The President of Columbia Services wrote to the President of Columbia Distributor informing him that the Fund was "still being plagued by market timers," and specifically that "[t]he timers are impacting [the portfolio manager's] ability to manage this fund, and likewise, impacting shareholders."

g.  In September 2002, Columbia Services reported to Columbia Distributor's Manager Director that, "Despite the tools currently available to us, timers continue to disrupt fund performance and management as well as exaggerate sales figures. Despite the concerns raised about the harm caused on the Columbia Funds by short-term or excessive trading, CMA and Columbia Distributor allowed this trading to continued through September 2003.

h.  In November 2002, a Columbia portfolio manager attempted to quantify the impact of fund timing: "[F]yi, the impact of market timers can be understood by looking at the mutual funds vs. a representative account run by the same manager with an identical mandate. [T]he tiger fund is a good example since [I] run both of these accounts. The estimate of 400 bps of impact would be a fair approximation. You can see the smaller funds of [J]apan and [E]urope have been hurt much worse..." The

-23-

smaller funds referred to in this message had their annual returns reduced by nine percent and five percent respectively.

71.    It is beyond doubt that CMA and it senior executives expressly authorized or tacitly permitted the market timing of the Columbia Funds.

### Columbia's Investment Advisory Agreements Were Approved as a Result of Misleading Disclosures

72.    Pursuant to section 15(a) of the ICA, 15 U.S.C. § 80a-15(a), investment advisors are retained by the mutual fund companies pursuant to investment advisory agreements which, among other things, detail the compensation to be provided by the fund to the advisor. These agreements must initially be approved by the vote of a majority of the outstanding voting stock of the fund, but they can be amended or renewed by either the shareholders or the fund directors/trustees. Advisory agreements may continue in effect for a period of more than two years from the date of its execution, but only so long as such continuance is specifically approved by the board of directors or by a vote of a majority of the outstanding voting securities of the fund. *See* ICA §15(a), 15 U.S.C. § 80a-15(a). In the present case, the current agreements between Plaintiffs' Funds and CMA was approved by the trustees of Plaintiffs' Funds.

73.    The advisory agreement is required by law to include a complete disclosure of all the compensation to be paid by the fund to the advisor. Here, neither the agreements nor CMA disclosed to the fund trustees that CMA and its affiliates were engaged in a scheme to allow their favored clients to market time the Columbia Funds, in violation of applicable laws and regulations, and in contravention of the fund's own stated management policies. To the contrary, it continued to represent that it would prohibit market timing and late trading.

-24-

74. These undisclosed market timing activities benefitted CMA because they entailed the rapid movement of hundreds of millions of dollars into and out of the funds. CMA's fees were calculated as a percentage of the total assets in the funds; these transactions artificially inflated the assets of the funds and therefore magnified CMA's fee. Moreover, these transactions also entailed a commitment by the customers to keep substantial assets in other Columbia Funds, thereby inflating the assets in those funds and the fees earned for managing them. By failing to disclose these substantial additional earnings being generated by this illicit scheme, CMA misrepresented the nature and sources of the earnings it and its affiliated companies were receiving.

75. According to the most recent Statement of Additional Information for the Columbia Young Investors Fund, dated February 4, 2004, incorporated by reference into the prospectus, the fund's trustees recently approved the annual extension of the advisory agreement between CMA and Columbia Young Investors Fund. Had CMA properly disclosed the market timing activities and the additional compensation it received as a direct result of its position as the advisor to the fund, the trustees would have, at the very least, renegotiated the compensation terms of the contract to reflect that and not simply renew the contract.

76. Lastly, by covering up this scheme CMA also led investors and fund trustees to believe that it was managing this and other Columbia Funds in compliance with all applicable federal laws and its own stated policies when, in fact, it was not.

## CAUSE OF ACTION

### (Violation of § 36(b) of the ICA)

77. Plaintiffs incorporate by reference the preceding paragraphs.

78. Although this cause of action is brought for the benefit of the Plaintiffs' Funds, plaintiffs bring it directly as shareholders under ICA § 36(b), 15 U.S.C. § 80a-35(b).

79. Section 36(b) creates a fiduciary duty on the part of all investment advisors, for the benefit of the funds they manage, in connection with the advisors' receipt of fees. This duty applies not only to the terms of the advisory fee agreements, but also to the manner in which advisors seek approval of such agreements. Thus, among other things, § 36(b) prohibits advisors from soliciting the approval of any advisory agreement from a fund board by use of false or misleading information, or by failing to disclose information material to the board's decision regarding their compensation. Information concerning conflicts of interest is particularly important to the funds and to their independent directors.

80. ICA § 36(b), 15 U.S.C. § 80a-35(b), creates a private right of action for all fund shareholders to enforce these duties in a direct action, even though the direct beneficiary of such an action is the fund itself.

81. By permitting, condoning and not disclosing the fact that shares of Columbia Funds, including two of Plaintiffs' Funds, were being subjected to market timing transactions by CMA's favored clients, defendant breached its fiduciary duties with respect to the receipt of compensation for services to Plaintiffs' Funds and in contravention of the ICA § 36(b), 15 U.S.C. §§ 80a-35(b).

WHEREFORE, plaintiffs pray for judgment as follows:

    A.    Rescinding and/or voiding the investment advisory agreements between defendant and Plaintiffs' Funds;

    B.    Returning the advisory fees paid by the Plaintiffs' Funds to defendant;

    C.    Awarding damages for violating section 15(a) of the ICA;

    D.    Awarding plaintiffs their costs and expenses for this litigation, including reasonable attorneys' fees and other disbursements; and

    E.    Awarding plaintiffs such other and further relief as may be deemed just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: Boston, Massachusetts
       March 16, 2004

                                                    Respectfully submitted,

                                                    *[signature]*

                                                  Alan L. Kovacs (BBO# 278240)
                                                  **LAW OFFICE OF ALAN L. KOVACS**
                                                  2001 Beacon Street
                                                  Suite 106
                                                  Boston, MA 02135
                                                  T: (617) 964-1177
                                                  F: (617) 332-1223

                                                  Stanley M. Grossman
                                                  H. Adam Prussin
                                                  Ronen Sarraf
                                                  **POMERANTZ HAUDEK BLOCK**
                                                      **GROSSMAN & GROSS LLP**
                                                   100 Park Avenue, 26th Floor
                                                  New York, New York 10017
                                                  T: (212) 661-1100
                                                  F: (212) 661-8665

                                                  Richard J. Vita (BBO# 510260)
                                                  **LAW OFFICES OF RICHARD J. VITA, P.C.**
                                                  77 Franklin Street, Suite 300
                                                  Boston, Massachusetts 02110
                                                  T: (617) 426-6566
                                                  F: (617) 357-1612

                                                  *Attorneys for Plaintiffs*